¶ 1.
ANNETTE KINGSLAND ZIEGLER, J.
This is a review of an unpublished decision of the court of appeals, State v. Weber, No. 2014AP304-CR, unpublished slip op. (Wis. Ct. App. Oct. 8, 2015) (per curiam), which reversed the Wood County circuit court's[1] order denying defendant Richard Weber's ("Weber") motion to suppress evidence of drunk driving, possession of marijuana, and possession of drug paraphernalia, and remanded the case to the circuit court with directions to vacate its judgment of conviction, permit Weber to withdraw his plea, and grant Weber's motion to suppress evidence. Weber, unpublished slip op., f¶ 1, 10.
*208 ¶ 2. A deputy of the Wood County sheriffs department attempted to pull Weber over on a public highway by activating the emergency lights on his vehicle after observing that Weber's vehicle had a defective high-mounted brake lamp and watching the vehicle weave over the highway's fog line. When Weber failed to yield to the traffic stop, the deputy pursued Weber into his driveway and apprehended him in his garage. The question before this court is whether the deputy's warrantless entry into Weber's garage and subsequent arrest of Weber violated the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution, or whether the need for a warrant was obviated by the exigent circumstance of the deputy's "hot pursuit" of a fleeing suspect who had committed jailable offenses. See, e.g., United States v. Santana, 427 U.S. 38 (1976).
¶ 3. We conclude that the deputy's warrantless entry into Weber's garage and subsequent arrest of Weber were constitutional because they were justified by the exigent circumstance of hot pursuit of a fleeing suspect who had committed jailable offenses. The deputy had probable cause to believe that Weber had committed two jailable offenses, immediately pursued Weber, and performed a limited entry into Weber's open garage for the purpose of preventing Weber's continued flight. Under these specific circumstances, the deputy's actions were constitutionally reasonable. Accordingly, we reverse the decision of the court of appeals.
I. FACTUAL BACKGROUND
f 4. On April 20, 2012, Deputy Calvin Dorshorst ("Deputy Dorshorst") of the Wood County sheriffs department and Weber were driving in separate ve- *209 hides in Arpin, Wisconsin. Deputy Dorshorst observed that the high-mounted brake lamp on Weber's vehicle was not working properly and saw Weber's vehicle "weave from its lane of travel" "[o]ver the white fog line." Deputy Dorshorst activated his vehicle's emergency lights in an attempt to conduct a traffic stop. Weber did not, however, stop his vehicle. Instead, he drove about 100 feet, turned into a driveway, and pulled into an attached garage. Deputy Dorshorst followed the vehicle and parked 15 to 20 feet behind it but outside of the garage with his vehicle's emergency lights still on. At some point during this process, Deputy Dorshorst "contact[ed] dispatch notifying them [he] had a traffic stop."
¶ 5. Weber and Deputy Dorshorst exited their vehicles at about the same time. Weber began moving toward a door of the attached house inside the garage. Deputy Dorshorst ran to the front of his vehicle and in the direction of the garage, where he witnessed Weber "walking slowly" and "somewhat staggering" up steps inside the garage leading to the door to the house. As Deputy Dorshorst ran toward Weber he told Weber to stop and that he needed to speak with him.[2] Weber did not stop but instead continued up the steps to the house. Deputy Dorshorst entered the garage and "secured [Weber's] arm" as Weber was "just inside his [house's] door" at the top of the steps. Weber stopped and Deputy Dorshorst explained that he had stopped Weber because of the defective high-mounted brake lamp on Weber's vehicle. Deputy Dorshorst asked Weber to accompany him to Weber's vehicle so that Deputy Dorshorst could "point out exactly the reason for the stop and which light was defective." During this *210 time Weber tried to pull away from Deputy Dorshorst and enter his house. Deputy Dorshorst noticed that Weber had "slow, slurred speech" and "glassy, bloodshot eyes." Additionally, Deputy Dorshorst could smell "a strong odor of intoxicants."
f 6. Weber and Deputy Dorshorst eventually exited the garage and walked back outside, where Deputy Dorshorst asked Weber if he had been drinking. Weber informed Deputy Dorshorst that "he was drinking at his residence and a while after drinking a couple of beers, he left and went to the Village of Arpin, at which time ... he went to another place and was drinking." Weber was "unable to identify" the location in Arpin to which he had traveled. After consuming "a few drinks" there, Weber explained, he had returned to his home. Weber informed Deputy Dorshorst that he thought he had had "way too much" alcohol.
¶ 7. Deputy Dorshorst asked Weber to perform field sobriety tests, but Weber refused. Weber then tried to leave and reenter his garage, but Deputy Dorshorst advised Weber he was not free to do so. Weber "aggressively pushed into [Deputy Dorshorst's] chest with his head" around the same time that a second deputy pulled into the driveway. Deputy Dor-shorst told Weber a second time that he was not free to leave. Weber "continued to resist," and the two deputies "escorted the defendant to the ground and secured his arms." Weber was put in handcuffs and placed under arrest.
¶ 8. The deputies searched Weber and he consented to a search of his vehicle. In the vehicle the deputies found "a tinfoil square folded up with [a] green leafy vegetable substance inside, which was later tested positive for [tetrahydrocannabinols]," as *211 well as a "metal pipe in the ashtray of the vehicle." The pipe "had a burned residue inside it" and "smelled of burnt marijuana."
¶ 9. Weber was eventually taken to a hospital where his blood was drawn. Later analysis of his blood showed a blood alcohol concentration of 0.24.
II. PROCEDURAL BACKGROUND
¶ 10. On July 9, 2012, a criminal complaint was filed against Weber in Wood County circuit court charging him with one count of operating while intoxicated, contrary to Wis. Stat. § 346.63(l)(a) (2011-12),[3] tenth and subsequent offense, see Wis. Stat. § 346.65(2)(am)7.; one count of operating with a prohibited alcohol concentration, contrary to § 346.63(l)(b), tenth and subsequent offense, see § 346.65(2)(am)7.; one count of possession of tetrahy-drocannabinols, contrary to Wis. Stat. § 961.41(3g)(e); possession of drug paraphernalia, contrary to Wis. Stat. § 961.573(1); and resisting an officer, contrary to Wis. Stat. § 946.41(1). On August 14, 2012, an information was filed in the case.
¶ 11. On October 24, 2012, Weber filed a motion collaterally attacking one of his prior convictions for drunk driving on the ground that he had not properly waived his right to counsel when entering his plea in that case. On October 29, 2012, Weber also moved the circuit court
for an order excluding [Weber's] illegal arrest and evidence obtained as a result of the illegal arrest, including but not limited to the following: the blood *212 alcohol concentration, officer's observations including glassy eyes, slurred speech, and odor of intoxicants, statements made by defendant, defendant's refusal to perform field sobriety tests, a metal pipe believed to be drug paraphernalia, and tin foil containing a green leafy vegetable substance believed to be tetrahydro-cannabinols.
¶ 12. On February 21, 2013, the circuit court granted Weber's motion collaterally attacking one of his prior convictions but denied Weber's suppression motion. As to the latter ruling, the circuit court concluded that Deputy Dorshorst's actions were justified by the exigent circumstance of hot pursuit. Specifically, Weber was fleeing Deputy Dorshorst's lawful attempts to stop him, Deputy Dorshorst had probable cause to believe that Weber was committing a crime in so doing, and Deputy Dorshorst's pursuit of Weber for this offense was "promptly made and maintained."
¶ 13. On May 23, 2013, an amended information was filed in the case. On the same day, Weber pleaded no contest to operating with a prohibited alcohol concentration, ninth offense, possession of tetrahydrocan-nabinols, and resisting an officer. The other two counts against Weber were dismissed. On August 6, 2013, the circuit court sentenced Weber to four years of initial confinement and four years of extended supervision on the operating with a prohibited alcohol concentration charge and ordered that Weber pay costs on the other two offenses. On August 12, 2013, the court's judgment of conviction of Weber was filed. On January 30, 2014, Weber filed a notice of appeal.
¶ 14. On October 8, 2015, the court of appeals reversed the circuit court's order denying Weber's motion to suppress evidence and remanded the case to the circuit court with directions to vacate its judgment *213 of conviction, permit Weber to withdraw his plea, and grant Weber's motion to suppress. Weber, unpublished slip op., ¶¶ 1, 10. The court of appeals explained that "the exigent circumstances requirement means that there must be a potential for danger to life, risk of evidence destruction, or likelihood of escape." Id,., ¶ 7. The court added that the State failed to explain how this standard was met; the State instead " appear [ed] to assume that all hot pursuits qualify as exigent circumstances" but "provide[d] no legal argument to support that assumption." Id., ¶¶ 8-9. The court itself "fail[ed] to discern why an immediate warrantless entry was justified" and ultimately reversed on the ground that the State had conceded Weber's argument by failing to rebut it. Id., ¶ 9 (citing Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp., 90 Wis. 2d 97, 108-09, 279 N.W.2d 493 (Ct. App. 1979)).
¶ 15. On November 6, 2015, the State filed a petition for review in this court. On February 3, 2016, this court granted the petition.
III. STANDARD OF REVIEW
¶ 16. "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact." State v. Iverson, 2015 WI 101, ¶ 17, 365 Wis. 2d 302, 871 N.W.2d 661 (quoting State v. Robinson, 2010 WI 80, ¶ 22, 327 Wis. 2d 302, 786 N.W.2d 463). In answering these types of questions, this court "review[s] the circuit court's findings of historical fact under a deferential standard, upholding them unless they are clearly erroneous," then "independently applies] constitutional principles to those facts." Id., ¶ 18 (quoting Robinson, 327 Wis. 2d 302, ¶ 22).
*214 IV. ANALYSIS
¶ 17. The Fourth Amendment to the United States Constitution provides:
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. Const, amend. IV.[4] Article I, Section 11 of the Wisconsin Constitution is a "substantively identical provision . . . that this court interprets consistently with the Fourth Amendment." State v. Richter, 2000 WI 58, ¶ 27, 235 Wis. 2d 524, 612 N.W.2d 29 (citing State v. Secrist, 224 Wis. 2d 201, 208, 589 N.W.2d 387 (1999)).
¶ 18. "It is a ' "basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."' Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (citation omitted) (quoting Groh v. Ramirez, 540 U.S. 551, 559 (2004)). Relevant to the warrantless home entry that occurred in this case,[5] this court has recognized that "a *215 home entry, though unaccompanied by a warrant, is lawful if 'exigent circumstances' are present," a condition satisfied when "it would be unreasonable and contrary to public policy to bar law enforcement officers at the door." State v. Ferguson, 2009 WI 50, ¶ 19, 317 Wis. 2d 586, 767 N.W.2d 187 (quoting Richter, 235 Wis. 2d 524, ¶ 28).
[T]here are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: 1) hot pursuit of a suspect, 2) a threat to the safety of a suspect or others, 3) a risk that evidence will be destroyed, and 4) a likelihood that the suspect will flee.
Id., ¶ 20 (quoting Richter, 235 Wis. 2d 524, ¶ 29). The State argues that the first of these categories, hot pursuit, justified Deputy Dorshorst's actions in this case.
¶ 19. Before this court will uphold Deputy Dor-shorst's warrantless entry on the grounds asserted, the State must "showQ that the warrantless entry was both supported by probable cause and justified by exigent circumstances." Robinson, 327 Wis. 2d 302, ¶ 24.[6] We now assess these two components of the State's claim.
*216 A. Probable Cause
¶ 20. "The probable cause requirement in the arrest context protects an individual's interest in his or her personal liberty. Thus, the proper inquiry in an arrest challenge is whether probable cause exists to believe that a particular suspect has committed a crime." State v. Hughes, 2000 WI 24, ¶ 20, 233 Wis. 2d 280, 607 N.W.2d 621 (citing State v. Kiper, 193 Wis. 2d 69, 82, 532 N.W.2d 698 (1995)).
Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime. There must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not.
Secrist, 224 Wis. 2d at 212 (citations omitted). The test to determine probable cause is objective, cf, e.g., Robinson, 327 Wis. 2d 302, f 26 (search case), and requires an examination of the totality of the circumstances. Kiper, 193 Wis. 2d at 82 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). Further, "probable cause eschews technicality and legalisms in favor of a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'" Secrist, 224 Wis. 2d at 215 (quoting Kiper, 193 Wis. 2d at 83).
f 21. The State argues that at the time of Deputy Dorshorst's entry into Weber's garage, Deputy Dor-shorst "had probable cause to believe that Weber had committed two jailable offenses," namely violations of *217 Wis. Stat. §§ 346.04(2t) ("Obedience to traffic officers, signs and signals; fleeing from officer.") and 946.41(1) ("Resisting or obstructing officer."). The first of these statutes provides, "No operator of a vehicle, after having received a visible or audible signal to stop his or her vehicle from a traffic officer or marked police vehicle, shall knowingly resist the traffic officer by failing to stop his or her vehicle as promptly as safety reasonably permits." § 346.04(2t). The second of these statutes criminalizes "knowingly resist [ing] or obstructing] an officer while such officer is doing any act in an official capacity and with lawful authority." § 946.41(1). Each of these offenses is punishable by a fine of $10,000, imprisonment for up to nine months, or both. Wis. Stat. §§ 346.17(2t), 946.41(1), 939.51(3)(a).
¶ 22. In response, Weber argues that probable cause was lacking for both jailable offenses because Deputy Dorshorst possessed no evidence that Weber "knowingly resisted]," Wis. Stat. §§ 346.04(2t), or "knowingly... obstruct[ed]," Wis. Stat. §946.41(1), Deputy Dorshorst.[7]
¶ 23. We conclude that at the time he entered Weber's garage, Deputy Dorshorst had probable cause to arrest Weber for violations of Wis. Stat. §§ 346.04(2t) and 946.41(1). Deputy Dorshorst activated his emergency lights while driving behind Weber's vehicle but Weber failed to pull over. Deputy Dorshorst pulled his flashing vehicle into Weber's driveway and parked it behind Weber's vehicle before Weber had even exited it, but Weber did not acknowledge the attempted stop. Deputy Dorshorst called after *218 Weber, but Weber made no reply. "We evaluate the existence of probable cause objectively, concerned with whether law enforcement acted reasonably." Robinson, 327 Wis. 2d 302, ¶ 26 (search case). Our focus is not on whether Weber in fact fled Deputy Dorshorst, but instead whether the circumstances would have led a reasonable law enforcement officer to believe that Weber was probably fleeing him. See Secrist, 224 Wis. 2d at 212. A reasonable law enforcement officer would conclude on this evidence that Weber was likely feigning ignorance and thus fleeing; most individuals would have responded to Deputy Dorshorst's obvious attempts to catch his attention. Cf. State v. Stewart, 143 Wis. 2d 28, 35, 420 N.W.2d 44 (1988) ("Intent may be inferred from the defendant's conduct. . . .").
¶ 24. Our conclusion that Deputy Dorshorst possessed probable cause to arrest Weber is only bolstered by the circuit court's finding that Weber was in fact "fleeing the deputy in order to avoid the stop," a finding which is not clearly erroneous because it is not "contrary to the great weight and clear preponderance of the evidence." State v. Popke, 2009 WI 37, ¶ 20, 317 Wis. 2d 118, 765 N.W.2d 569 (quoting State v. Turner, 136 Wis. 2d 333, 343, 401 N.W.2d 827 (1987)). Consequently, we are "bound not to upset" the court's factual finding. Id. (emphasis added) (quoting Turner, 136 Wis. 2d at 343); see also Iverson, 365 Wis. 2d 302, ¶ 18 (characterizing applicable standard of review as "deferential" (quoting Robinson, 327 Wis. 2d 302, ¶ 22)).
¶ 25. Weber contends that Deputy Dorshorst's verbal directive to Weber to stop as Weber neared his door is irrelevant to a probable cause analysis because Weber was already in the garage when it was issued. We reject this argument. The relevant question at this *219 stage of the analysis is whether an officer would reasonably conclude prior to the officer's warrantless entry that Weber had committed a jailable offense and was now fleeing from arrest for that crime. Cf, e.g., Santana, 427 U.S. at 42 ("In Warden v. Hayden, 387 U.S. 294 (1967), we recognized the right of police, who had probable cause to believe that an armed robber had entered a house a few minutes before, to make a warrantless entry to arrest the robber and to search for weapons."). Weber's failure to respond to highly noticeable "visible [and] audible signal[s]" directed at him while he was in the street and in his garage, Wis. Stat. § 346.04(2t), strongly suggested that he was in the process of knowingly fleeing Deputy Dorshorst's lawful stop. We stress that "an officer's conclusions must be reasonable under the circumstances, not technically certain." Secrist, 224 Wis. 2d at 215.
The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers.
Id. (quoting Texas v. Brown, 460 U.S. 730, 742 (1983) (plurality opinion)). This court can properly consider Deputy Dorshorst's oral commands.[8]
*220 ¶ 26. Before he entered Weber's garage, the evidence before Deputy Dorshorst suggested, at the very least, that it was as likely as not that Weber had committed jailable offenses by failing to pull to the side of the road as soon as reasonably possible. Consequently, Deputy Dorshorst possessed probable cause to arrest Weber. See Secrist, 224 Wis. 2d at 212 (citing State v. Mitchell, 167 Wis. 2d 672, 681-82, 482 N.W.2d 364 (1992)). To conclude that probable cause does not exist on these facts could be construed as a sea change in the law. Weber's defense as to why he did not pull over earlier, instead proceeding into his garage and attempting to enter his home, all while the law enforcement vehicle had its emergency lights activated and despite Deputy Dorshorst calling out to him, is a question for the jury to weigh and consider but is not determinative of probable cause. The court's determination of probable cause is distinct from a defense. Neither statute at issue prescribes a time or distance requirement. This court should neither read such a requirement into the statute nor conflate the question of probable cause with a potential defense.
*221 B. Exigent Circumstances
¶ 27. We must next examine whether the exigencies of the situation justified Deputy Dorshorst's entry into Weber's garage, or whether Deputy Dorshorst was constitutionally required to obtain an arrest warrant. As discussed, the State relies on Deputy Dorshorst's "hot pursuit" of Weber to validate the entry.[9]
¶ 28. Both this court and the Supreme Court of the United States have recognized that "law enforcement officers may make a warrantless entry onto private property... to engage in ' "hot pursuit"' of a fleeing suspect." Stuart, 547 U.S. at 403 (quoting Santana, 427 U.S. at 42-43); see, e.g., Ferguson, 317 Wis. 2d 586, ¶ 20 (characterizing "hot pursuit of a suspect" as one of several "well-recognized categories of exigent circumstances" (quoting Richter, 235 Wis. 2d 524, 1 29)). The basic ingredient of the exigency of hot pursuit is "immediate or continuous pursuit of [a suspect] from the scene of a crime." Richter, 235 Wis. 2d 524, ¶ 32 (alteration in original) (quoting State v. Smith, 131 Wis. 2d 220, 232, 388 N.W.2d 601 (1986), abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775).
¶ 29. For example, in Santana, a seminal case on hot pursuit, the Supreme Court concluded that officers with probable cause to arrest a defendant standing in the threshold of her residence and who "retreat [ed] into . . . her house" as the officers attempted to seize her could enter "through the open door" and "catch [] her in the vestibule." Santana, 427 U.S. at 40, 42-43. *222 And in Richter, this court determined that an officer responding to a report of a burglary at a trailer park who was told by the victim upon arrival that the burglar had entered a certain trailer could enter that trailer without a warrant. Richter, 235 Wis. 2d 524, ¶¶ 1-2.
¶ 30. Again, "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness,'" and "the warrant requirement is subject to certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011) (alteration in original) (quoting Stuart, 547 U.S. at 403). The necessity—and thus intuitive reasonableness—of a hot pursuit doctrine in our constitutional law is apparent. In many cases, hot pursuit into a residence will serve the purposes of protecting a home's occupants, c.f., e.g., Hayden, 387 U.S. at 298-99, or preventing the destruction of evidence. See, e.g., Santana, 427 U.S. at 43. But "[e]xigent circumstances exist when 'it would be unreasonable and contrary to public policy to bar law enforcement officers at the door,'" Ferguson, 317 Wis. 2d 586, ¶ 19 (quoting Richter, 235 Wis. 2d 524, ¶ 28), and even in the absence of these additional benefits, the hot pursuit doctrine serves an important public policy purpose:
Law enforcement is not a child's game of prisoner[']s base, or a contest, with apprehension and conviction depending upon whether the officer or defendant is the fleetest of foot. A police officer in continuous pursuit of a perpetrator of a crime committed in the officer's presence .. . must be allowed to follow the suspect into a private place, or the suspect's home if he chooses to flee there, and effect the arrest without a warrant.
State v. Sanders, 2008 WI 85, ¶ 133, 311 Wis. 2d 257, 752 N.W.2d 713 (Prosser, J., concurring) (alteration in original) (quoting State v. Blake, 468 N.E.2d 548, 553 *223 (Ind. Ct. App. 1984)); see also Santana, 427 U.S. at 42 (refusing to permit a defendant to "thwart an otherwise proper arrest" by withdrawing into her home). "[Cheating an incentive for .. . suspects to flee to the home to escape lawful arrest," Sanders, 311 Wis. 2d 257, ¶ 133 (Prosser, J., concurring), generates disrespect for the law and for law enforcement, risks putting the public and any participants in the chase in harm's way, and expends valuable law enforcement resources. Consequently, the hot pursuit doctrine helps ensure that a criminal suspect will not be rewarded for fleeing the police and that the police will not be penalized for completing a lawful attempt to apprehend a suspect, who, by his own actions, has drawn the police into his home.
¶ 31. Before proceeding, we reemphasize an important dimension of the hot pursuit doctrine. In Welsh v. Wisconsin, 466 U.S. 740 (1984), which was not a hot pursuit case, Welsh, 466 U.S. at 753, the Supreme Court characterized its earlier decision in Santana as involving the "hot pursuit of a fleeing felon." Id. at 750 (emphasis added) (citing Santana, 427 U.S. at 42-43). The court also concluded that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made." Id. at 753. After Welsh, some uncertainty existed regarding whether the hot pursuit doctrine was limited to those cases where officers were in pursuit of a "fleeing felon." Compare, e.g., Sanders, 311 Wis. 2d 257, ¶¶ 77-83, 122, 134 (Prosser, J., concurring), with id., ¶¶ 147, 149, 152 (Butler, J., concurring).
¶ 32. In Ferguson this court concluded that "Welsh and Santana did not create a bright-line rule requiring the underlying offense to be labeled a felony *224 in order for exigent circumstances to justify a warrant-less home entry." Ferguson, 317 Wis. 2d 586, ¶ 27 (footnote omitted) (citing Sanders, 311 Wis. 2d 257, ¶ 71 (Prosser, J., concurring)). We instead clarified that "courts, in evaluating whether a warrantless entry is justified by exigent circumstances, should consider whether the underlying offense is a jailable or nonjailable offense, rather than whether the legislature has labeled that offense a felony or a misdemeanor." Id., ¶ 29.
f 33. Since then, the Supreme Court has confirmed our view that Welsh and Santana do not create a felony-misdemeanor distinction, stating:
[TJhough Santana involved a felony suspect, we did not expressly limit our holding based on that fact. ... Welsh . . . [did not] involve]] hot pursuit. Thus, despite our emphasis in Welsh on the fact that the crime at issue was minor—indeed, a mere nonjailable civil offense—nothing in the opinion establishes that the seriousness of the crime is equally important in cases of hot pursuit.
Stanton v. Sims, 571 U.S._, 134 S.Ct. 3, 6 (2013) (per curiam) (citations omitted). While the Court in Stanton acknowledged a "basic disagreement" among "federal and state courts nationwide... on the question whether an officer with probable cause to arrest a suspect for a misdemeanor may enter a home without a warrant while in hot pursuit of that suspect," it did not "express [a] view" on the ultimate question. Id. at 5, 7. Consequently, Ferguson remains the law and dictates that the mere fact that the underlying offenses at issue in this case are misdemeanors is not a bar to application of the hot pursuit doctrine.
*225 ¶ 34. On the other hand, the State urges this court to establish a rule that "hot pursuit of a suspect based on probable cause for a jailable offense" will always justify a warrantless home entry and arrest. We decline to conclude that the confluence of hot pursuit and probable cause to arrest for a jailable offense will always justify a warrantless entry. The "touchstone of the Fourth Amendment is reasonableness," and "[reasonableness ... is measured in objective terms by examining the totality of the circumstances." Ohio v. Robinette, 519 U.S. 33, 39 (1996) (quoting Florida v. Jimeno, 500 U.S. 248, 250 (1991)).
¶ 35. Evaluation of all the circumstances in this case convinces us that Deputy Dorshorst's entry into Weber's garage was constitutionally reasonable.
¶ 36. To begin with, Deputy Dorshorst was indeed engaged in "immediate or continuous pursuit of [a suspect] from the scene of a crime." Richter, 235 Wis. 2d 524, ¶ 32 (alteration in original) (quoting Smith, 131 Wis. 2d at 232). He was attempting to apprehend Weber, who was fleeing Deputy Dorshorst's lawful traffic stop on a public highway. There was no delay between Weber's illegal actions and Deputy Dorshorst's pursuit of Weber. Cf. id., ¶ 36 ("There is no evidence in this record of any delay in [the deputy's] response or pursuit that would have interrupted the immediacy and continuity of the situation and therefore dissipated the exigency.").
¶ 37. Next, violations of the statutes at issue, Wis. Stat. §§ 346.04(2t) and 946.41(1), are jailable offenses, Wis. Stat. §§ 346.17(2t), 946.41(1), 939.51(3)(a), and thus significantly grave. Cf. Ferguson, 317 Wis. 2d 586, ¶ 29 ("[C]ourts, in evaluating whether a warrant-less entry is justified by exigent circumstances, should *226 consider whether the underlying offense is a jailable or nonjailable offense .. .The available penalties—up to nine months in prison for violations of each statute, §§ 346.17(2t), 946.41(1), 939.51(3)(a)—demonstrate that the State has a strong "interest in arresting individuals suspected of committing [these] offense[s]." Welsh, 466 U.S. at 754 n.14.
¶ 38. We note that Deputy Dorshorst's intrusion here was appropriately limited. Cf., e.g., Santana, 427 U.S. at 42-43 ("This case ... is clearly governed by Warden [v. Hayden]; the need to act quickly here is even greater than in that case while the intrusion is much less." (emphasis added) (citing Hayden, 387 U.S. 294)); id. at 43-44 (White, J., concurring) ("In these circumstances, a warrant was not required to enter the house to make the arrest, at least where entry by force was not required." (emphasis added)).[10] Deputy Dor- *227 shorst did not damage any property, open any doors or windows, or pull out any weapons. He simply stepped into Weber's open garage and seized his arm. The two actions—entry and apprehension—were calculated to accomplish no more than was absolutely necessary to halt Weber's escape. Additionally, the entry was a last resort. Deputy Dorshorst had already attempted to stop Weber by activating his emergency lights and calling after him; it was due to Weber's actions that Deputy Dorshorst was forced to enter the garage to accomplish the stop. Finally, Deputy Dorshorst ended the intrusion promptly, staying in the garage no longer than needed. Cf., e.g., State v. Legg, 633 N.W.2d 763, 773 (Iowa 2001) ("Another important circumstance in this case is the nature of the intrusion. [The officer] entered [the defendant's] garage, not her house proper as in Santana or her bedroom as in Welsh. ... In addition, the magnitude of the infringement was rather slight. [The officer's] entry into [the defendant's] garage was no surprise to her; he was following closely on her heels when she entered the garage. In *228 addition, he entered through an open door and took only three steps inside. Thus, the intrusion was peaceful and restricted to that which was necessary to allow the officer to speak with [the defendant]." (citation omitted)); State v. Pinkard, 2010 WI 81, ¶¶ 41-42, 55, 327 Wis. 2d 346, 785 N.W.2d 592 (analyzing "reasonable [ness]" of "police conduct" in community caretaker context by considering, inter alia, "the degree of overt authority and force displayed," including whether "any of the . . . officers employed any force or drew their weapons" and "the availability, feasibility and effectiveness of alternatives to the type of intrusion actually accomplished" (quoting State v. Kramer,, 2009 WI 14, ¶ 41, 315 Wis. 2d 414, 759 N.W.2d 598)).[11]
¶ 39. Deputy Dorshorst's actions in this case were manifestly reasonable. As the State observed at oral argument, "this case is not about a bad brake light." Instead, it is about a defendant, Weber, who declined to submit to a law enforcement officer's lawful attempts to conduct a traffic stop. Had Weber chosen to stop on the highway, or even in his driveway, Deputy Dorshorst never would have entered his garage. This is not the type of conduct that the Fourth Amendment brands "unreasonable"; the Fourth Amendment does not dictate that officers who fail to outpace suspects on their way to a residence are unable to act. See Sanders, 311 Wis. 2d 257, ¶ 133 (Prosser, J., concurring) (quoting Blake, 468 N.E.2d at 553). Taking the time to obtain an *229 arrest warrant in this case would have required Deputy Dorshorst to halt an arrest which had already begun outside of Weber's home, an arrest lawfully premised on probable cause that Weber had committed jailable offenses and one which required minimal intrusion to complete. For numerous policy reasons we have already discussed, an arrest warrant is simply not mandated under these circumstances. See, e.g., id. (Prosser, J., concurring) ("The enforcement of our criminal laws . .. is not a game where law enforcement officers are 'it' and one is 'safe' if one reaches 'home' before being tagged." (quoting Gasset v. State, 490 So. 2d 97, 98-99 (Fla. Dist. Ct. App. 1986) (denying certiorari))).[12]
¶ 40. A counterargument could be made that Deputy Dorshorst should nonetheless have attempted to secure a warrant to arrest Weber. Presumably, Deputy Dorshorst would have needed to stop at Weber's driveway and let Weber flee into the residence, then call for backup, secure a perimeter around the house so that Weber did not continue his attempts to escape law enforcement, and obtain a warrant. And then what? Would those who support this argument have Deputy Dorshorst knock on the door? Given that Weber was openly fleeing Deputy Dorshorst, it is far from clear Weber simply would have turned around and opened the door for him. If Weber did not open the door, was Deputy Dorshorst then to break the door in and appre *230 hend Weber inside his actual house as opposed to inside his open garage? Especially compared to that scenario, an immediate and limited entry into Weber's open garage to complete the stop was an appropriate approach.
¶ 41. The court of appeals below settled upon a version of Weber's argument, stating that "the exigent circumstances requirement means that there must be a potential for danger to life, risk of evidence destruction, or likelihood of escape," Weber, unpublished slip op., ¶ 7, and suggested that such factors are not present in this case. Id., ¶ 9. This is a form of the " 'hot pursuit plus' approach that upholds hot pursuits for offenses of varying degrees of seriousness where there are other exigent circumstances present, for example threats of violence or destroyed evidence, or other emergencies or dangerous situations." Sanders, 311 Wis. 2d 257, ¶ 153 (Butler, J., concurring) (emphasis added). But this approach is contradicted by our case law. See id., f 118 (Prosser, J., concurring) ("There is no implication in our case law that 'hot pursuit' cannot stand alone as an exigent circumstance justifying a warrantless home entry and arrest. On the contrary, our cases explicitly recognize that hot pursuit is a sufficient justification for a warrantless entry and arrest." (citing Smith, 131 Wis. 2d at 229; Richter, 235 Wis. 2d 524, ¶ 29)).
¶ 42. In Richter, for example, this court upheld a warrantless entry into a trailer on the basis of both hot pursuit of a fleeing suspect and the need to protect the occupants of the trailer. Richter, 235 Wis. 2d 524, ¶ 2. But our analysis made clear that these were independent justifications. Id., ¶ ¶ 32-37, 41 ("We conclude that [the deputy's] entry was justified by the exigent circumstance of hot pursuit. The State also argues that this *231 entry was justified by the exigency of a threat to the safety of the suspect or others. .. . [W]e conclude that [the deputy] reasonably believed that the intruder he was pursuing posed a threat to the safety of the occupants of Richter's trailer." (emphasis added)). And it would be somewhat strange to continually list "hot pursuit of a suspect" as one of "four well-recognized categories of exigent circumstances" separate from, "a threat to the safety of a suspect or others," "a risk that evidence will be destroyed," and "a likelihood that the suspect will flee" if one of these additional categories were required in order to justify a warrantless entry following hot pursuit of a suspect. Id., ¶ 29 (citing Smith, 131 Wis. 2d at 229); Ferguson, 317 Wis. 2d 586, ¶ 20 (quoting Richter, 235 Wis. 2d 524, ¶ 29). Although the presence of one or more of these additional exigencies is relevant to the question of whether a warrantless entry is permitted, it is not a prerequisite to application of the hot pursuit doctrine. See, e.g., Commonwealth v. Jewett, 31 N.E.3d 1079, 1089 n.8 (Mass. 2015) ("The defendant also attempts to argue that hot pursuit is not an exigency unto itself where the underlying crime is not felonious, but rather additional factors, such as the crime being violent or the suspect being armed, must be satisfied in order to justify a warrantless entry. We disagree with this contention."); People v. Wear, 867 N.E.2d 1027, 1045 (Ill. Ct. App. 2007) ("Most courts appear to take Santana's holding at face value, treating hot pursuit as an exception unto itself rather than as just another factor." (citations omitted)), aff'd, 893 N.E.2d 631 (2008); Sanders, 311 Wis. 2d 257, ¶¶ 119-32 (Prosser, J., concurring) (collecting cases).[13]
*232 ¶ 43. Before we conclude, we acknowledge the concern that applying the hot pursuit doctrine to uphold a warrantless entry in a case where fleeing law enforcement was itself the violation giving rise to the pursuit will lead to the application of the hot pursuit doctrine in every case involving a fleeing suspect, no matter the gravity of the first offense committed, since flight itself can constitute a jailable offense. The objection is a legitimate one, but it fails to persuade for several reasons. First, the State will not always be able to establish probable cause that the suspect was knowingly fleeing. Second, as stated above, we decline to adopt the per se rule set forth by the State. The "touchstone of the Fourth Amendment is reasonableness," and "[r]easonableness ... is measured in objective terms by examining the totality of the circumstances." Robinette, 519 U.S. at 39 (quoting Jimeno, 500 U.S. at 250). Third, application of the hot pursuit doctrine in this scenario is not circular (i.e., the pursuit justifying the pursuit) because the legislature did not have to make knowingly fleeing a traffic stop a jailable offense, either at all or in all circumstances. That it has chosen to do so means that this court must treat it with *233 the seriousness that it does other jailable offenses.[14] And fourth, a contrary holding would lead to the opposite problem: in every case involving a nonjailable offense, suspects would have an incentive to flee law enforcement because flight itself would not justify application of the hot pursuit doctrine.
¶ 44. The record demonstrates that Weber committed jailable offenses and attempted to evade lawful apprehension and that Deputy Dorshorst's pursuit and response was immediate and measured. A warrant was not necessary here; it was reasonable for Deputy Dorshorst to effectuate the lawful arrest he had begun outside of Weber's home.
V. CONCLUSION
¶ 45. We conclude that the deputy's warrantless entry into Weber's garage and subsequent arrest of Weber were constitutional because they were justified by the exigent circumstance of hot pursuit of a fleeing *234 suspect who had committed jailable offenses. The deputy had probable cause to believe that Weber had committed two jailable offenses, immediately pursued Weber, and performed a limited entry into Weber's open garage for the purpose of preventing Weber's continued flight. Under these specific circumstances, the deputy's actions were constitutionally reasonable. Accordingly, we reverse the decision of the court of appeals.
By the Court.—The decision of the court of appeals is reversed.

 The Honorable Gregory J. Potter presided.

 There may be some dispute as to the deputy's position at the time he first spoke to Weber. For a discussion, see infra, n.8.

 All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

 The Fourth Amendment applies to the states through the Fourteenth Amendment. E.g., State v. Kramer, 2009 WI 14, ¶ 18 & n.6, 315 Wis. 2d 414, 759 N.W.2d 598 (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

 The State does not disagree with Weber's position that his garage was protected under the Fourth Amendment as curtilage of his home. See, e.g., State v. Davis, 2011 WI App 74, ¶¶ 9-15, 333 Wis. 2d 490, 798 N.W.2d 902.

 One fact that we need not consider in this case is Deputy Dorshorst's ''subjective motivation" for entering Weber's garage. Brigham City v. Stuart, 547 U.S. 398, 404 (2006). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' "Id. (alteration in original) (quoting Scott v. United States, 436 U.S. 128, 138 (1978)). "[W]hen an officer's Fourth Amendment search and seizure conduct is supported by an objectively ascertainable basis for probable cause or reasonable suspicion, the police conduct meets the Fourth Amendment's requirement of reasonableness, thereby causing subjective motivations to be of little concern." Kramer, 315 Wis. 2d 414, ¶ 27 (citing Whren v. United States, 517 U.S. 806, 811 (1996)).

 Weber does not develop independent arguments relating to other portions of the statutes.

 Weber comments that "[t]he circuit court did not make an explicit finding as to whether the deputy was inside or outside the garage when he first spoke to [Weber]." Afair reading of the record makes clear that a finding that Deputy Dorshorst was outside the garage at the time he first spoke to Weber was at least implicit. Deputy Dorshorst specifically testified that he was not in the garage prior to first speaking to Weber. The circuit court concluded that "[o]nce inside the garage, [Weber] did not wait for the deputy to approach," but "instead at *220 tempted to flee the deputy, even after obtaining verbal commands." The court then continued, "because of the defendant's actions, the deputy took pursuit." (Emphasis added.) In other words, the court found that Weber's failure to respond to Deputy Dorshorst's verbal commands partly caused and thus preceded Deputy Dorshorst's entry into the garage.
But even if the circuit court failed to make a specific finding on this point, to the extent such a finding would be outcome-determinative, we can assume the trial court made it. See State v. Echols, 175 Wis. 2d 653, 673, 499 N.W.2d 631 (1993) ("When a trial court does not expressly make a finding necessary to support its legal conclusion, an appellate court can assume that the trial court made the finding in the way that supports its decision." (citing State v. Wilks, 117 Wis. 2d 495, 503, 345 N.W.2d 498 (Ct. App. 1984), aff'd, 121 Wis. 2d 93, 358 N.W.2d 273 (1984)).

 Instead of relying on theories that were not briefed or argued, we base our conclusions on the long-established doctrine of hot pursuit.

 As part of its analysis in United States v. Santana, 427 U.S. 38 (1976), the Supreme Court examined whether Santana possessed an "expectation of privacy" while standing in the doorway of her home. See Santana, 427 U.S. at 42. One might argue that this reasoning is now suspect under two recent Supreme Court cases, United States v. Jones, 565 U.S._, 132 S. Ct. 945 (2012), and Florida v. Jardines, 569 U.S._, 133 S. Ct. 1409 (2013), to the extent those cases are read to emphasize the idea that "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas .. . [the Fourth Amendment] enumerates." Jones, 132 S. Ct. at 950; see Jardines, 133 S. Ct. at 1414.
Jones and Jardines are both search cases. See Jones, 132 S. Ct. at 949 ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" (footnote omitted)); id. at 958 (Alito, J., concurring) ("The Court does not contend that there was a seizure."); Jardines, 133 S. Ct. at 1414 ("We granted certiorari, limited to the question of whether the officers' behavior was a search within the meaning *227 of the Fourth Amendment."). Moreover, the Santana court's discussion of Santana's expectation of privacy pertained to whether she was in a public place "when the police first sought to arrest" her at the "threshold of [her] dwelling," not whether the area in which she was actually arrested, "the vestibule of her house," was protected by the Fourth Amendment. Santana, 427 U.S. at 40-43. The Supreme Court's acknowledgement of the degree of the officers' "intrusion" in that case occurred during its subsequent consideration of whether the police could follow Santana into her house to effect an arrest. Id. at 42. Here, Weber was clearly in a public place when Deputy Dorshorst began his pursuit. And there is no dispute that a seizure eventually occurred in Weber's home. The question at issue is thus whether, under the totality of the circumstances, the seizure which undoubtedly occurred was constitutionally reasonable.

 Our community caretaker line of cases sets forth guidelines in a separate Fourth Amendment context for analyzing different aspects of intrusions by the State. See, e.g., State v. Pinkard, 2010 WI 81, ¶¶ 29, 41-42, 327 Wis. 2d 346, 785 N.W.2d 592. The cases are by no means controlling here, but are instead merely a helpful tool for discussing the reasonableness of Deputy Dorshorst's actions.

 We are not persuaded by Weber's references to general language in Missouri v. McNeely, 569 U.S._, 133 S. Ct. 1552 (2013). McNeely did not involve the hot pursuit doctrine. McNeely, 133 S. Ct. at 1558 (describing question at issue as "whether the natural dissipation of alcohol in the bloodstream establishes a per se exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations").

 The court of appeals below essentially relied on a discussion from this court's opinion in Smith to derive a test for exigent circumstances in the hot pursuit context, State v. Weber, *232 No. 2014AP304-CR, unpublished slip op., ¶¶ 4, 7 (Wis. Ct. App. Oct. 8, 2015) (per curiam) (citing State v. Smith, 131 Wis. 2d 220, 229, 231, 388 N.W.2d 601 (1986), abrogated on other grounds by State v. Felix, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 601 (1986)), but as the Sanders concurrence explained, the test for exigent circumstances set forth in that case does not apply to the hot pursuit doctrine. See State v. Sanders, 311 Wis. 2d 257, ¶ 117 (Prosser, J., concurring) ("[Hot pursuit] is not part of the objective test set forth in Smith ... ."). Additionally, Smith was not a hot pursuit case. See Smith, 131 Wis. 2d at 231-32 (summarily dismissing possibility of a hot pursuit claim in a single paragraph because "[t]he underlying offense... occurred nearly three weeks earlier").

 For example, with regard to Wis. Stat. § 946.41(1), "[desisting or obstructing officer," we note that the legislature provided for steeper criminal penalties when a violation involves aggravating circumstances, such as injury to an officer, § 946.41(2r)-(2t), or, after a violator has given false information or placed physical evidence with intent to mislead an officer and a trier of fact at a criminal trial has considered this information or evidence, conviction of an innocent person as a result of that trial, § 946.41(2m). The legislature could easily have taken similar steps in the opposite direction, instituting less significant penalties when resistance or obstruction is tied to potentially less serious circumstances, such as a traffic stop for a broken brake light. But it did not do so; any violation of § 946.41(1) is at least a Class A misdemeanor. § 946.41(1). Thus the legislature has indicated that it finds resistance or obstruction of an officer to be a serious matter regardless of the underlying circumstances.