COURT OF APPEALS
DECISION
DATED AND FILED

August 2, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP7-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CM1893**

IN COURT OF APPEALS
DISTRICT III

---

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

KALLIE M. GAJEWSKI,

DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Marathon County: MICHAEL K. MORAN, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

¶1 STARK, P.J. Kallie M. Gajewski was arrested after she was forcibly removed by law enforcement officers from the porch of her residence. She appeals from a judgment convicting her of operating a motor vehicle while intoxicated (OWI), fourth offense within five years, pursuant to WIS. STAT.

§ 346.63(1)(a) (2019-20).[1] Gajewski argues that the circuit court erred by denying her motion to suppress the fruits of an illegal arrest based on her unlawful seizure within the curtilage of her home. As Gajewski's arrest within her home's curtilage occurred without either a warrant or an exception to the warrant requirement, we conclude that her arrest was unlawful under the Fourth Amendment.

¶2  We agree with the State, however, that at the time of Gajewski's unlawful arrest, law enforcement possessed probable cause to arrest her for obstructing an officer. Thus, pursuant to *New York v. Harris*, 495 U.S. 14 (1990), and *State v. Felix*, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775, the blood test evidence police subsequently obtained outside of Gajewski's home with her consent is admissible in her criminal prosecution. We therefore affirm the judgment of the circuit court.

## BACKGROUND

¶3  The facts in this case are generally undisputed. On August 28, 2016, at approximately 12:28 a.m., Officer Marcus Goetsch of the Athens Police Department responded to a report of a vehicle stopped in the middle of the road with its engine and lights off. The eyewitness reported that the driver was a woman in a blue Saturn parked on Corlad Road and that the "driver looked like she was drunk or on drugs."

¶4  While en route to Corlad Road, Goetsch stopped and spoke through his open vehicle window with a woman driving a blue Saturn. He asked the driver

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted. We acknowledge that events in the case occurred in 2016, but because the relevant statutes have not been amended, we will reference the current, 2019-20 version.

2

if a vehicle was parked in the roadway on Corlad Road, and she responded in the affirmative. Goetsch did not believe this individual to be the same one from the report, as he believed the eyewitness was watching the suspect vehicle from his or her home. When he arrived at the location, however, the suspect vehicle was gone. Goetsch would later discover that the woman in the blue Saturn he spoke with while en route to Corlad Road was Gajewski.

¶5 After Goetsch arrived at Corlad Road, dispatch advised that the suspect vehicle was traveling northbound on Iron Bridge Road, but Goetsch was unable to locate the vehicle. Dispatch then reported that the suspect vehicle was seen on Schweizer Road. While on Schweizer Road, Goetsch spoke with an "Amish gentleman" who told him "that a car had pulled into a residence on the south side of Schweizer Road at the top of the hill." Goetsch proceeded to that address, but he did not see the suspect vehicle in either the driveway or in front of the garage. He continued down Schweizer Road, but he was unsuccessful in locating the suspect vehicle. He returned to the previously visited address and "observed tire tracks pulling into that address." He then pulled further into the driveway at that address where he observed a blue Saturn in the home's backyard.

¶6 After reporting to dispatch that he believed he had located the suspect vehicle, Goetsch approached the home to "check on" the blue Saturn. He was greeted by "two large dogs" that "were barking and holding their ground." Goetsch did not "feel it was safe to proceed by [him]self"; he returned to his vehicle to wait for Deputy Brandon Stroik of the Marathon County Sheriff's Office, who had been "several miles away" but en route since the original report. While he waited, Goetsch saw a woman—later identified as Gajewski—come out of the house and bring the dogs inside. He exited his vehicle and told Gajewski he

needed to speak to her, but she went back inside the house without acknowledging him.

¶7 When Stroik arrived, the officers approached Gajewski's home. The home—a single-wide trailer home—had two doors, one facing the road and one facing the backyard, each with a porch.[2] The officers each went to a different door. Stroik knocked on the back door but received no response. He then exited the porch and walked toward the blue Saturn, at which time Gajewski opened her door and stepped out onto her porch. Both officers approached to speak with her, but they remained on the ground and did not re-enter the porch.

¶8 Stroik began questioning Gajewski about her evening. During the conversation, Stroik "noticed a strong odor of intoxicants coming from her person," and he observed that "[h]er eyes were glassy and bloodshot." While Goetsch noted no odor from Gajewski "from [his] position," both officers agreed that her speech was impaired, such that it "seemed really slurred," and "she might have been under the influence of something." According to the officers' testimony, Gajewski repeatedly denied driving that evening. Stroik testified that, at this point, he had no knowledge that Goetsch recognized Gajewski from earlier in the evening, and he did not "recall exactly" what, if anything, Goetsch said to Gajewski on this subject. For his part, Goetsch testified that he confronted Gajewski with the information that he "had seen her earlier driving her car," and that is when Gajewski "quickly ended the conversation and tried running back in the house."

---

[2] Goetsch testified that the porch was wooden and measured approximately ten feet by ten feet with "two or three steps going up to it." It was enclosed by a railing.

¶9 As Gajewski approached her door to go inside her home, Stroik ordered Gajewski to stop, but she did not. Stroik and Goetsch then entered Gajewski's porch, and Stroik "grabbed her sweatshirt" as she opened the door. Goetsch grabbed Gajewski by the arm she was using to hold the door. Gajewski's dogs came to her aid, and the officers reported that they heard her say "get him" to the dogs. Stroik told Gajewski to stop resisting or he would tase her. The officers then placed Gajewski in handcuffs, led her off the porch, and directed her to a squad car.[3]

¶10 At the squad car, Stroik removed Gajewski's handcuffs and attempted to conduct field sobriety tests, which she refused. He placed Gajewski in handcuffs again, put her in the back of the squad car, and drove her to the hospital. While en route, he stopped to complete the OWI citation and the Informing the Accused Form. Gajewski consented to a chemical blood test, which revealed a blood alcohol concentration (BAC) of 0.268.

¶11 The State charged Gajewski with OWI, fourth offense in five years. Gajewski filed two motions to suppress evidence: the first to suppress statements made before she had received *Miranda*[4] warnings and the second to suppress the fruits of an illegal arrest, including the BAC results. The circuit court held multiple hearings on the motions. At the first hearing, the court heard testimony from the officers, and the parties stipulated to the introduction of Stroik's squad

---

[3] Stroik testified that he briefly placed Gajewski in the back of the squad car while he "attempted to make contact with the reporting party to arrange a positive identification from them," but that is when "Officer Goetsch advised [him] he had observed the defendant driving the vehicle that was parked now behind the residence in the yard" and he no longer needed the identification.

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

car video. The court agreed to watch the video prior to ruling on the motions, and it also provided an opportunity for supplemental briefing.

¶12    After supplemental briefing, the circuit court issued an oral ruling on the ***Miranda*** suppression motion only. The court found that Gajewski was in custody "at the point where she attempted to enter into the house and was told she could not enter the house and was not free to leave at that point" and "any statements made after that point … are post custody and pre-***Miranda***." Thus, the court concluded that any statements Gajewski made during her custodial interrogation would have to be suppressed. The court also asked for additional briefing on the unlawful arrest issue, noting that the parties failed to address ***State v. Weber***, 2016 WI 96, 372 Wis. 2d 202, 887 N.W.2d 554, and specifically the "hot pursuit" doctrine in the supplemental briefs.

¶13    After further briefing, the circuit court issued a second oral ruling. The court acknowledged that under the relevant case law, the porch where Gajewski was arrested is part of the curtilage area of her home. The court determined, however, that the officers had probable cause to believe that Gajewski had committed a crime—obstruction, a jailable offense—by providing them false information about her whereabouts that evening. The court therefore concluded that the officers were "at that point constitutionally justified under hot pursuit to prevent her [from entering her home] and to arrest her." At the hearing, defense counsel asked for clarification regarding the exigent circumstances, arguing that "[h]ot pursuit is not in itself an exigency." The court clarified that the exigency was also "the fact that she was suspected of a drunk driving case," the fact that she was exhibiting signs of intoxication, and "[t]he dissipation of potential collectable evidence." For those reasons, the court denied the motion to suppress.

¶14     Gajewski filed a motion to reconsider. She argued that because the officers lacked a warrant, they needed probable cause and exigent circumstances to enter onto her porch and arrest her. She reiterated that the State had not met its burden to establish exigent circumstances, as the dissipation of alcohol in a person's body is not per se an exigency. *See **Missouri v. McNeely***, 569 U.S. 141, 144 (2013).

¶15     The circuit court issued an oral ruling denying Gajewski's motion to reconsider. The court retreated from its previous finding of exigent circumstances. Instead, it reasoned that "[t]his was a stop and arrest case," and it found that there "wasn't any warrantless entry in the home." The court held that the officers had probable cause to arrest Gajewski for obstruction and "possible probable cause to arrest for OWI." According to the court, "if the defendant exits the home and comes onto a porch, though that may be curtilage …, that is an invitation to further subject yourself to law enforcement." Thus, "when [Gajewski] came out to talk to [the officers] she … provided probable cause and then attempted to flee into her home," and the officers were entitled to arrest her.

¶16     After the circuit court denied her suppression motion, Gajewski pled no contest to OWI, fourth offense within five years. The court withheld sentence and placed her on three years' probation. Gajewski appeals.[5]

---

[5] An order denying a motion to suppress evidence may be reviewed on appeal notwithstanding the defendant's guilty or no-contest plea. WIS. STAT. § 971.31(10).

## DISCUSSION

¶17    On appeal, Gajewski argues that her arrest in the curtilage of her home violated her Fourth Amendment rights, as the officers lacked a warrant or an exception to the warrant requirement.[6]  An order granting or denying a motion to suppress presents a question of constitutional fact.  ***State v. Dearborn***, 2010 WI 84, ¶13, 327 Wis. 2d 252, 786 N.W.2d 97.  We review the circuit court's findings of fact under a clearly erroneous standard, but "[t]he application of constitutional principles to those facts is a question of law that we review de novo."  ***Id.***

¶18    The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.[7]  There are certain foundational principles under the Fourth Amendment that we know to be true.  First, a police officer's *warrantless* entry into a private residence, either to make an arrest or to search, is presumptively unreasonable.  *See **Payton v. New York***, 445 U.S. 573, 586 (1980); ***State v. Reed***, 2018 WI 109, ¶¶52, 54 & n.27, 384 Wis. 2d 469, 920 N.W.2d 56.

---

[6] Although Gajewski filed two suppression motions, the circuit court's denial of her motion to suppress evidence from her unlawful arrest is the only issue in this appeal.  The State does not challenge the court's decision to grant Gajewski's motion to suppress the statements she made before receiving ***Miranda*** warnings.

[7] The Fourth Amendment is made applicable to the states by the Fourteenth Amendment.  *E.g.*, ***State v. Kramer***, 2009 WI 14, ¶18 & n.6, 315 Wis. 2d 414, 759 N.W.2d 598.  "The Wisconsin Constitution contains a substantively identical provision, art. I, sec. 11, that this court interprets consistently with the Fourth Amendment."  ***State v. Richter***, 2000 WI 58, ¶27, 235 Wis. 2d 524, 612 N.W.2d 29.

"It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted); *see also Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion.").

¶19 Second, it is well settled that "[t]he protection provided by the Fourth Amendment to a home also extends to the curtilage of a residence." *State v. Martwick*, 2000 WI 5, ¶26, 231 Wis. 2d 801, 604 N.W.2d 552 (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)); *State v. Dumstrey*, 2016 WI 3, ¶¶22-23, 366 Wis. 2d 64, 873 N.W.2d 502. "The area 'immediately surrounding and associated with the home'" is considered the home's curtilage. *Florida v. Jardines*, 569 U.S. 1, 6 (2013) (citation omitted). "[T]he curtilage is the area to which extends the intimate activity associated with the 'sanctity of a [person's] home and the privacies of life' and therefore has been considered part of [the] home itself for Fourth Amendment purposes." *Oliver*, 466 U.S. at 180 (citation omitted).

I.    *Gajewski's Warrantless Arrest in the Curtilage of Her Home Violated the Fourth Amendment.*

¶20    The parties appear to agree that Gajewski was arrested[8] within an area subject to Fourth Amendment protections, and we concur.  Gajewski's arrest occurred on her porch.  A "porch is the classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'"  ***Jardines***, 569 U.S. at 7 (citation omitted).  The circuit court properly concluded that Gajewski's porch was part of the curtilage of her home, and the State concedes the same.[9]  Thus, Gajewski was arrested within the curtilage of her home, an area subject to Fourth Amendment protections.  *See **Martwick***, 231 Wis. 2d 801, ¶26.

¶21    We must next determine whether Gajewski's arrest "was accomplished through an unlicensed physical intrusion."  *See **Jardines***, 569 U.S. at 7.  There is no dispute that law enforcement did not have a warrant.  Thus, Gajewski's arrest in the curtilage of her home is presumptively unreasonable.  *See **Payton***, 445 U.S. at 586.  However, the presumption against warrantless entry into

---

[8] The parties do not dispute at what point Gajewski was arrested, and both parties appear to assume that she was arrested on her porch and not at some other point.  Further, the circuit court found that Gajewski was in custody "at the point where she attempted to enter into the house and was told she could not enter the house and was not free to leave at that point."  We agree and conclude that Gajewski was seized for Fourth Amendment purposes when Stroik grabbed her sweatshirt, Goetsch grabbed her arm, and she was placed in handcuffs by both officers while on the porch of her home.  *See **California v. Hodari D.***, 499 U.S. 621, 626 (1991) (explaining that a person is seized when there is "a laying on of hands or application of physical force to restrain movement" and the person submits); *see also **State v. Ferguson***, 2009 WI 50, ¶17, 317 Wis. 2d 586, 767 N.W.2d 187 ("An arrest is a seizure invoking protections afforded under the Fourth Amendment of the United States Constitution ….").

[9] As the parties agree the circuit court properly concluded that Gajewski's back porch was part of the curtilage of her home, we need not analyze Gajewski's porch under the factors enumerated in ***United States v. Dunn***, 480 U.S. 294 (1987).  *See **State v. Dumstrey***, 2016 WI 3, ¶32, 366 Wis. 2d 64, 873 N.W.2d 502.

the home or curtilage is subject to certain exceptions. *State v. Hughes*, 2000 WI 24, ¶17, 233 Wis. 2d 280, 607 N.W.2d 621.

¶22 One such exception exists when officers are confronted with exigent circumstances. *See State v. Ferguson*, 2009 WI 50, ¶19, 317 Wis. 2d 586, 767 N.W.2d 187. In that event, the State may rebut the presumption that the officers' warrantless entry was unreasonable by proving by clear and convincing evidence that (1) the officers had probable cause to believe that Gajewski had committed a jailable offense and (2) exigent circumstances necessitated prompt action. *See Hughes*, 233 Wis. 2d 280, ¶¶17-18 (citing *Payton*, 445 U.S. at 575, 583-88); *State v. Hay*, 2020 WI App 35, ¶11, 392 Wis. 2d 845, 946 N.W.2d 190; *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) ("[P]olice officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home."); *see also Ferguson*, 317 Wis. 2d 586, ¶29 ("[C]ourts, in evaluating whether a warrantless entry is justified by exigent circumstances, should consider whether the underlying offense is a jailable or nonjailable offense …."). The State bears the burden of demonstrating that the warrantless entry was both supported by probable cause and justified by exigent circumstances. *Hay*, 392 Wis. 2d 845, ¶11.

¶23 Under Wisconsin law, it is well established that "[w]arrantless entry is permissible only where there is urgent need to do so, coupled with insufficient time to secure a warrant." *State v. Smith*, 131 Wis. 2d 220, 228, 388 N.W.2d 601 (1986), *abrogated on other grounds by Felix*, 339 Wis. 2d 670, ¶42.

> There are four well-recognized categories of exigent circumstances that have been held to authorize a law enforcement officer's warrantless entry into a home: (1) hot pursuit of a suspect, (2) a threat to the safety of a suspect or others, (3) a risk that evidence will be destroyed, and (4) a likelihood that the suspect will flee.

*State v. Richter*, 2000 WI 58, ¶29, 235 Wis. 2d 524, 612 N.W.2d 29.

¶24    In this case, the circuit court did not base its conclusion that Gajewski's arrest was lawful on a finding that exigent circumstances existed, and the State has not argued that any of the recognized categories of exigent circumstances were present.[10]  We refuse to develop these arguments for the State. *See **State v. Pettit***, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we may decline to consider arguments that are undeveloped); ***Industrial Risk Insurers v. American Eng'g Testing, Inc.***, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82 ("Arguments unsupported by legal authority will not be considered, and we will not abandon our neutrality to develop arguments." (citation omitted)).

¶25    Instead of addressing the exigency question, the State spends a substantial portion of its brief arguing that the "officers were justified in going onto Gajewski's porch because the porch is a semi-public place where the general public can go to knock on the door."  The State's argument is surprising given its concession that Gajewski's porch is part of the curtilage of her home and the volume of case law indicating that the curtilage shares the same Fourth Amendment protections as the home itself.  The State argues that because

---

[10] As noted above, the circuit court originally found exigent circumstances, but upon Gajewski's motion for reconsideration, it moved away from that reasoning in support of its conclusion that there was no warrantless entry into Gajewski's home.  Further, although the State argued in its briefing before the circuit court that the officers were in hot pursuit of a fleeing suspect, that argument was devoid of any legal authority, and, further, the State has abandoned this argument on appeal.  *See **A.O. Smith Corp. v. Allstate Ins. Cos.***, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned.").  According to the State, "The circuit court did not rely on the hot pursuit doctrine when it denied Gajewski's suppression motion, because it concluded that the officers did not enter Gajewski's home to arrest her.  Because the circuit court was correct, the State will not address hot pursuit in this brief."

Gajewski "left the privacy and safety of her home" and came "out onto her porch to engage the officers, she had no reasonable expectation of privacy towards the officers. The officers, therefore, did not violate the Fourth Amendment when they went onto Gajewski's porch—but not inside her home—and arrested her." Essentially, the State claims an exception to the warrant requirement because Gajewski was in plain view, and the officers had implicit permission to be on Gajewski's porch under the "knock and talk" rule.

¶26    The United States Supreme Court recognized the constitutionality of the so-called "knock and talk" procedure in *Jardines*. That case addressed whether using a drug-sniffing dog on a homeowner's porch is a "search" within the meaning of the Fourth Amendment. While the Court found the dog sniff to be a constitutional violation, it acknowledged an "implicit license" allowing a

> visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave…. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do."

*Jardines*, 569 U.S. at 8 (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)). A home's occupant, however, is free not to answer the door or speak to the police, "[a]nd even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *King*, 563 U.S. at 469-70.

¶27    The State argues, citing to *Jardines*, 569 U.S. at 8, and *State v. Edgeberg*, 188 Wis. 2d 339, 344, 348, 524 N.W.2d 911 (Ct. App. 1994), "that the Fourth Amendment is not implicated by an officer's entry on private land to knock on a citizen's door for legitimate police purposes." That fact, however, is both not

in dispute and not at issue in this appeal. Gajewski is not claiming that law enforcement violated her constitutional rights by coming to her home, entering her porch, knocking on her door, and asking to speak with her.[11] Instead, Gajewski's argues that the officers unlawfully seized her in the curtilage of her property, when she attempted to enter her home, without a warrant or probable cause *and* exigent circumstances. *Jardines* and *Edgeberg* cannot reasonably be said to stand in opposition to Gajewski's claim.

¶28    According to the State, "[t]he situation here is somewhat like the one in *United States v. Santana*, 427 U.S. 38, 42 (1976)." In *Santana*, officers had probable cause to arrest Santana, but they lacked either an arrest or a search warrant. *Id.* at 39-41. When officers arrived at Santana's home, they saw Santana in her doorway. *Id.* at 40. She turned and fled into the home; officers chased her inside and arrested her. *Id.* at 40-41. The State essentially argues that *Santana* holds that officers may arrest a person at the doorway of a home as long as the person is in the public view (and therefore no longer has any expectation of privacy).

---

[11] In her motion for reconsideration, Gajewski did suggest that officers lingered on her property beyond the time reasonably allowed under *Florida v. Jardines*, 569 U.S. 1 (2013). She stated,

> Prior to contact being made, law enforcement circled her house multiple times, shining flashlights on, in, and around her home. The officers knew that the defendant was in the home and was not willing to speak to them, yet they continued to trespass upon the curtilage of her home without consent or a warrant.

Gajewski does not develop this argument on appeal, however, and we therefore do not address it. *See A.O. Smith Corp.*, 222 Wis. 2d at 491.

¶29    For several reasons, we conclude that **Santana** is not controlling here. First, **Santana** predates the curtilage doctrine; accordingly, that doctrine was never raised and never addressed by the Court in that case. The Court would not clarify Fourth Amendment rights related to the curtilage until years later in **Oliver**, 466 U.S. at 180.

¶30    Second, **Santana** addressed the right to be free from intrusions based on a reasonable expectation of privacy outlined in **Katz v. United States**, 389 U.S. 347, 351 (1967), not the right to be free from improper trespasses into constitutionally protected areas. *See* **United States v. Jones**, 565 U.S. 400, 406, 409 (2012) ("Fourth Amendment rights do not rise or fall with the **Katz** formulation…. [T]he **Katz** reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." (citations omitted)); **Dumstrey**, 366 Wis. 2d 64, ¶28 (same); *see also* **Jardines**, 569 U.S. at 11 ("[W]e need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under **Katz**."); **Weber**, 372 Wis. 2d 202, ¶130 (A. Bradley, J., dissenting) ("Fourth Amendment jurisprudence emphasizing privacy over trespass is now inconsistent with **Jones** and **Jardines**.").

¶31    Third, the facts in this case are diametrically different from those in **Santana**. **Santana** involved a combination of probable cause, hot pursuit, and other exigent circumstances. **Santana**, 427 U.S. at 42-43; *see also* **Welsh**, 466 U.S. at 750 (characterizing **Santana** as a case involving "hot pursuit of a fleeing felon"). As we addressed above, in this case, the State has not argued on appeal that any exigency existed. Gajewski's arrest was not set in motion in a public place such that she was attempting to escape to a private place while an officer was in hot pursuit.

15

¶32     The State has cited no other case law for the proposition that officers may conduct a "knock and talk" and then arrest the person without a warrant when the individual comes to the door, stands within the home's curtilage, and exposes himself or herself to public view, absent a warrant exception. If that were the case, it would upend four decades of Fourth Amendment jurisprudence as it relates to the curtilage.

¶33     The relevant case law is clear: the curtilage is entitled to the same protections as the home under the Fourth Amendment; a porch is considered curtilage; thus, officers must have a warrant or a warrant exception, such as probable cause plus exigent circumstances, to arrest someone in the curtilage of his or her home. *See Dumstrey*, 366 Wis. 2d 64, ¶¶22-23; *Weber*, 372 Wis. 2d 202, ¶18 & n.5 (not disputing parties' agreement that the garage was protected as curtilage under the Fourth Amendment and characterizing law enforcement's actions as a "warrantless home entry" that was lawful only if exigent circumstances were present). Gajewski's arrest occurred within the curtilage of her home without a warrant, and the State has failed to establish that exigent circumstances existed justifying law enforcement's entry into that protected space. Therefore, Gajewski's arrest was unlawful.

II.     *The Circuit Court Properly Denied Gajewski's Motion to Suppress Evidence Obtained After Her Warrantless Arrest.*

¶34     Given our conclusion that Gajewski's arrest in the curtilage of her home was in violation of *Payton* and her Fourth Amendment rights, we next address whether the evidence obtained from her blood draw must be suppressed as a fruit of an illegal arrest under the exclusionary rule. *See Smith*, 131 Wis. 2d at 240. "Under the exclusionary rule, evidence obtained in violation of the Fourth Amendment is generally inadmissible in court proceedings." *State v. Scull*, 2015

WI 22, ¶20, 361 Wis. 2d 288, 862 N.W.2d 562 (citing *Mapp v. Ohio*, 367 U.S. 643, 655 (1961)). In *Harris*, however, the United States Supreme Court declined to apply the exclusionary rule to *Payton* violations where evidence is gathered outside of the home. *Harris*, 495 U.S. at 17, 21. The Court held that "where the police have probable cause to arrest a suspect, the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his [or her] home, even though the statement is taken after an arrest made in the home in violation of *Payton*." *Harris*, 495 U.S. at 21.

¶35  Our supreme court adopted the *Harris* rule in *Felix*, concluding that the rule "appropriately balances the purposes of the exclusionary rule and the *Payton* rule with the social costs associated with suppressing evidence." *Felix*, 339 Wis. 2d 670, ¶¶38-39. In *Felix*, police had probable cause to arrest the defendant, but he was arrested in his residence without a warrant. *Id.*, ¶44. Despite his unlawful arrest, the court applied the *Harris* rule, concluding that the defendant's clothing, a DNA sample, and a *Mirandized* statement were admissible. *Felix*, 339 Wis. 2d 670, ¶¶45-50. The court held that "where police had probable cause to arrest before the unlawful entry, a warrantless arrest from [the defendant's] home in violation of *Payton* requires neither the suppression of statements made outside of the home … nor the suppression of physical evidence obtained from [the defendant] outside of the home." *Felix*, 339 Wis. 2d 670, ¶4.

¶36  Given the holding in *Felix*, in order to determine whether Gajewski's blood test results must be suppressed, we must determine whether the officers in this case had probable cause to arrest Gajewski prior to her unlawful arrest. We note that given the circuit court found that Gajewski's arrest was lawful, it did not apply the holding in *Felix*, and neither the State nor Gajewski

17

addressed whether the blood test results were required to be suppressed in light of that decision.

¶37 On appeal, Gajewski argues in her brief-in-chief and reply brief that her arrest was not supported by probable cause because at the time Stroik grabbed her sweatshirt, prevented her from entering her home, and made the arrest, he was "unaware that Goetsch had seen Ms. Gajewski driving earlier in the evening." Thus, Gajewski argues that unlike Goetsch, Stroik did not have probable cause to arrest her for either OWI or obstruction. In response, the State invokes the collective knowledge doctrine,[12] claiming that "it is not required that the arresting officer has knowledge sufficient for probable cause, only that the officers together had sufficient knowledge."

¶38 We determined that supplemental briefing on the issue of probable cause was necessary. We therefore requested supplemental briefing regarding two topics: (1) "whether the facts demonstrate that the officers in this case had probable cause to arrest" Gajewski, addressing "how the collective knowledge doctrine may apply under the circumstances" and the distinction between jailable and non-jailable offenses; and (2) "assuming without deciding that we conclude the officers had probable cause to arrest Gajewski, … whether the rule set forth in [*Felix*] applies under the circumstances as to the remedy for any alleged Fourth Amendment violation."

---

[12] Under the collective knowledge doctrine, a court's assessment of whether an arrest is supported by probable cause is made by looking at the collective knowledge of the officers involved. *See State v. Mabra*, 61 Wis. 2d 613, 625, 213 N.W.2d 545 (1974); *State v. Pickens*, 2010 WI App 5, ¶11, 323 Wis. 2d 226, 779 N.W.2d 1 (2009).

¶39 In their supplemental briefing, the parties disagree as to whether the collective knowledge doctrine applied to provide Stroik with probable cause to arrest Gajewski. The State argues that "the information Officer Goetsch knew was properly imputed to Deputy Stroik, who was at the scene working with Officer Goetsch and in communication with him," while Gajewski argues that "[s]imply being in proximity to an officer with the relevant knowledge does not satisfy the elements of the collective knowledge doctrine." The parties agree, however, that if we determine that the officers had probable cause to arrest Gajewski, then *Felix* "dictates admission" of the evidence.[13]

¶40 We conclude that Goetsch had probable cause to arrest Gajewski prior to her unlawful arrest, and as both officers detained Gajewski and placed her into custody, it is unnecessary to apply the collective knowledge doctrine under the circumstances. "Probable cause to arrest is the quantum of evidence within the arresting officer's knowledge at the time of the arrest which would lead a reasonable police officer to believe that the defendant probably committed or was committing a crime." *State v. Secrist*, 224 Wis. 2d 201, ¶19, 589 N.W.2d 387 (1999). For probable cause to exist, "[t]here must be more than a possibility or suspicion that the defendant committed an offense, but the evidence need not

---

[13] While Gajewski concedes that *State v. Felix*, 2012 WI 36, 339 Wis. 2d 670, 811 N.W.2d 775, would apply under these circumstances, she argues that "*Felix* was wrongly decided." According to Gajewski, *New York v. Harris*, 495 U.S. 14 (1990), "held that *statements* made outside the home after an illegal in-home arrest need not be suppressed," while *Felix* "held the exclusionary rule inapplicable to statements and *any other evidence* gathered outside of the home"; therefore, "*Felix* went further than the federal constitution allows." We are bound by our supreme court's decision in *Felix*. *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). Further, this is not the first time we have applied *Felix* under similar circumstances. *See, e.g.*, *State v. McGinnis*, No. 2018AP1388-CR, unpublished slip op. (WI App Oct. 8, 2019); *State v. Schiewe*, No. 2012AP2767-CR, unpublished slip op. (WI App Oct. 24, 2013). Unpublished opinions authored by a member of a three-judge panel or by a single judge and issued on or after July 1, 2009, may be cited for their persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

reach the level of proof beyond a reasonable doubt or even that guilt is more likely than not." *Id.* Our review of a probable cause determination presents a mixed question of fact and law. *County of Jefferson v. Renz*, 231 Wis. 2d 293, 316, 603 N.W.2d 541 (1999). We will uphold findings of fact unless clearly erroneous, but we will determine de novo whether those facts satisfy the standard for probable cause. *Id.*

¶41    The circuit court concluded that the officers had probable cause to arrest Gajewski for obstructing an officer, under WIS. STAT. § 946.41,[14] and "possible probable cause to arrest for OWI." On the issue of obstructing an officer, the court based its conclusion on the fact that Gajewski told the officers "that she had not left the home that evening and had been home the entire time, even though the law enforcement officer who was there observed her, according to his testimony, driving just shortly before they came to the house."

¶42    At the time both officers engaged Gajewski in conversation when she was on her porch, Goetsch knew, based on his personal observations and the information provided by police dispatch, that (1) a citizen reported that a blue Saturn had stopped in the middle of Corlad Road and was not moving; (2) the citizen believed the driver was intoxicated; (3) based on the reports from police dispatch and his own investigation, Goetsch tracked the blue Saturn to the general vicinity of Gajewski's home; (4) there was a blue Saturn in the driveway behind

---

[14] A person violates WIS. STAT. § 946.41(1) when he or she "knowingly resists or obstructs an officer while such officer is doing any act in an official capacity and with lawful authority." "Obstructs" under the statute means "knowingly giving false information to the officer or knowingly placing physical evidence with intent to mislead the officer in the performance of his or her duty." Sec. 946.41(2)(a); *see also* WIS JI—CRIMINAL 1766A (2010). Obstruction of an officer is punished as a Class A misdemeanor, *see* § 946.41(1), which subjects an individual to up to nine months of imprisonment and/or a fine, *see* WIS. STAT. § 939.51(3)(a).

Gajewski's residence; and (5) Gajewski exhibited slurred speech, had a hard time following directions and answering questions, and it appeared that she was under the influence of something.

¶43 Further, when Stroik began asking Gajewski questions about where she had been that evening, she denied leaving her house. Goetsch testified that what Gajewski "was telling Deputy Stroik was not matching up with what I had observed. I believe she was saying she was home all evening and didn't go anywhere. She was home by herself. I knew those statements to be false because I had just observed her earlier." Goetsch explained that he saw Gajewski retrieve her dogs before Stroik arrived on scene, and he "exited [his] vehicle, told [Gajewski] that [he] needed to speak with her." When asked at the hearing if he had "seen that person before," he replied, "Yes, it was the same person that I had seen driving the blue Saturn parked on the corner of County Trunk M and Corlad Road." Thus, Goetsch was aware that Gajewski was the same individual that he had seen on the road in the blue Saturn prior to Stroik arriving on the scene. According to Goetsch's testimony, he informed Gajewski that he "had seen her earlier driving her car." It was at this point, Goetsch explained, that Gajewski attempted to return inside her house.[15]

¶44 Based upon the foregoing facts—which were known to Goetsch before he and Stroik entered Gajewski's curtilage and arrested her—we agree that

---

[15] Stroik, for his part, did not recall Goetsch saying that he had seen Gajewski driving, or at least he did not hear Goetsch make that statement. Our independent review of Stroik's squad car video, which included audio, suggests that Goetsch may have made a statement prior to Gajewski attempting to enter her home, but we were unable to hear what Goetsch may have said. We note that the squad car and camera were facing the front of Gajewski's home, while the officers and Gajewski were speaking at the back of her home. Thus, their conversation and Gajewski's arrest was audible, but not visible.

a reasonable police officer would conclude that Gajewski had obstructed an officer during a lawful investigation. As noted above, the officers were lawfully present at Gajewski's home to investigate the report of a possible OWI.[16] During the course of that lawful investigation, Gajewski provided false information to the officers, and Goetsch knew the information was false. Accordingly, we conclude that it was reasonable for Goetsch to believe that Gajewski probably was committing the crime of obstructing an officer. *See Secrist*, 224 Wis. 2d 201, ¶19.

¶45 To the extent the parties argue that the collective knowledge is or is not applicable under the circumstances, we conclude that we need not apply that doctrine as Gajewski was arrested by both officers contemporaneously. Thus, the fact that Goetsch had probable cause to arrest Gajewski was sufficient without requiring Stroik to have the same information or have any information imputed to him. As the record indicates, when Gajewski attempted to end the conversation and tried running back inside her home, both Stroik and Goetsch followed her onto the porch to stop her from entering her home. Stroik testified that he grabbed her "sweatshirt to prevent her from fleeing" and he "told her to stop resisting or she would be tased based on the physical resistance." Stroik then testified that

---

[16] Although not addressed in detail, the circuit court also found "possible probable cause to arrest for OWI" based on the officers' observations that Gajewski "had glassy eyes and slurred speech … and they had reason to believe she may have been driving." We acknowledge that the facts establish, at the very least, reasonable suspicion that Gajewski had committed an OWI. Because we conclude that Goetsch had probable cause to arrest Gajewski for obstruction, we need not decide whether either officer had probable cause to arrest Gajewski for an OWI offense at the point she was arrested on her porch. Further, we need not address Gajewski's argument that even if the officers had probable cause to arrest her for OWI, they did not know at that time that Gajewski had any prior OWI convictions; therefore, at most, the officers had probable cause to believe that Gajewski committed a *nonjailable* offense. *See State v. Larson*, 2003 WI App 150, ¶19 n.4, 266 Wis. 2d 236, 668 N.W.2d 338 (noting that first-offense OWI "only results in a nonjailable civil forfeiture if convicted" and, thus, the officer "was investigating a nonjailable traffic incident").

"Officer Goetsch and I were able to secure her in handcuffs." Consistent with Stroik's account, Goetsch testified that he "grabbed one of [Gajewski's] arms that was holding the door, placed it behind her back just trying to gain control of her so she wouldn't run inside…. We were able to free [Gajewski's] arms from the doorway and get her back on the porch." Accordingly, it is clear that Gajewski's—admittedly unlawful—arrest was a co-arrest, as both Stroik and Goetsch detained her and placed her in custody. Goetsch had probable cause to do so.

¶46 Having concluded that Goetsch had probable cause to arrest Gajewski for obstructing an officer at the time of her unlawful arrest in the curtilage of her home, we conclude the circuit court properly denied Gajewski's motion to suppress evidence. Under *Harris* and *Felix*, only evidence obtained from inside a home need be suppressed following an illegal arrest in the home or its curtilage. *See Harris*, 495 U.S. at 17; *Felix*, 339 Wis. 2d 670, ¶¶38-39. Thus, Gajewski's blood test results—to which she consented and which were obtained outside her home after her arrest—are admissible. Accordingly, we affirm the judgment of conviction.

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.